UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>ex rel. CHARLES W. TANG<br>308 Berry Street, SE<br>Vienna, VA 22180<br><br>PLAINTIFF<br><br>v.<br><br>INTERNATIONAL BUSINESS<br>MACHINES CORPORATION,<br>a Delaware corporation,<br>1 New Orchard Road<br>Armonk, NY 10504-1722<br><br>DEFENDANT | <u>FILED UNDER SEAL</u><br><u>PURSUANT TO 31</u><br><u>U.S.C. § 3730(b)(2)</u><br><br><u>JURY TRIAL</u><br><u>DEMANDED</u> |

## COMPLAINT FOR VIOLATIONS
## OF FEDERAL FALSE CLAIMS ACT (Title 31, U.S.C. §§ 3729, et seq.)

Plaintiff CHARLES W. TANG ("Relator") files this Complaint on behalf of the United

States and himself against DEFENDANT INTERNATIONAL BUSINESS MACHINES

CORPORATION ("IBM") and alleges as follows:

### INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United

States of America arising from false statements and false or fraudulent claims made, or caused to

be made, by the Defendant, IBM, to the United States in violation of the False Claims Act, Title

31 U.S.C. §§ 3729 *et seq.*, as amended ("FCA").

## FEDERAL FALSE CLAIMS ACT

2.       The FCA was originally enacted in 1863 during the Civil War.  In 1986, finding

that fraud in federal programs was pervasive and that the FCA was in need of modernization, the

United States Congress substantially revised the FCA by passing the False Claims Amendments

Act.  Characterizing the FCA as a primary tool for combating government fraud, Congress used

the 1986 amendments to enhance the government's ability to recover losses sustained as a result

of fraud against the United States.  Congress intended that the amendments create incentives for

individuals with knowledge of fraud against the government to disclose the information without

fear of reprisals or government inaction.

3.       The FCA provides that any person who knowingly submits, or causes the

submission of, a false or fraudulent claim to the government for payment or approval is liable for

a civil penalty from $10,781 up to $21,563[1] for each such claim, plus three times the amount of

the damages sustained by the government.   The Act empowers persons having information

regarding a false or fraudulent claim against the government to bring an action on behalf of the

government and to share in any recovery.  The Complaint must be filed under seal for 60 days

(without service upon the Defendant during that time to allow the government time to conduct its

own investigation and to determine whether to join the action).

4.       Pursuant to the FCA, the Relator seeks to recover damages and civil penalties

arising from IBM's materially false and fabricated statements presented to agencies of the

federal government relating to amounts allegedly owed and required to be paid to IBM under

---

[1]       These recently revised penalty amounts took effect August 1, 2016, and apply to violations occurring after
November 2, 2015, per a Department of Justice Interim Rule. 81 Fed. Reg. 42491 (June 30, 2016).  Violations
occurring before November 2, 2015 are subject to the previous statutory penalty range of $5,500 to $11,000
per claim.

certain software enterprise license agreements between IBM and the agencies, as more fully identified herein.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to §§ 3729 and 3730 of Title 31.

6.      This Court has personal jurisdiction over IBM pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the Defendant can be found in, resides or transacts, or has transacted business in the District of Columbia.

7.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the Defendant can be found in, resides or transacts, or has transacted business in, the District of Columbia, and because some of the acts complained of herein occurred in the District of Columbia.

## THE PARTIES

8.      Relator Charles W. Tang ("Mr. Tang") was, at all relevant times, a senior sales representative in IBM's Federal Software Sales Group.  Between December, 2010 and mid-2014, Mr. Tang was primarily responsible for promoting sales of IBM's "WebSphere" brand of software to federal government agencies, including the Centers for Medicare and Medicaid ("CMS").

9.      In early 2014, Mr. Tang began transitioning from the CMS account within IBM to IBM's account for the Social Security Administration ("SSA").  In working for IBM on federal government agency accounts, Mr. Tang became aware of the use of compliance audits to force large contracts with other federal agencies, including the United States Customs and Border

Protection Agency ("CBP"), the United States Postal Service ("USPS"), and the Internal Revenue Service ("IRS").

10.     Mr. Tang has a comprehensive knowledge of the federal marketplace from the perspective of direct sales to government agencies, system integrators, professional service partners, and value-added resellers. He has successfully sold software and related products to commercial accounts and government agencies for many years. He has broad experience with enterprise software solutions, including network/systems management, application development, business intelligence, "e-training," deployment, and usage or compliance audits.

11.     IBM is a multi-national corporation that is known worldwide for its computers, software, and enterprise solutions, among other things. It is a publicly-traded company on the New York Stock Exchange, and is also listed among the Fortune 100. It is registered as a New York corporation and is headquartered in Armonk, NY.

12.     IBM offers organizations, businesses, and government agencies a wide variety of computer hardware, mainframes, software, and business solutions. Specifically, with respect to its software offerings, IBM has a large variety of license types it offers to clients and customers for use on mainframe computers or in a distributed software environment, *i.e.,* software that runs on independent or networked servers.

13.     This case is brought for violations of the False Claims Act, 31 U.S.C. §§ 3729(a) *et seq.*, for, *inter alia*, false or fraudulent claims made by IBM to multiple government agencies - CMS, SSA, CBP, and USPS - in the solicitation and inducement of, and the ultimate sale and execution of, enterprise license agreements by and between IBM and each of the foregoing United States federal government agencies, as well as other false and deceptive acts by IBM, as further described herein.

## THE CLAIMS

**A.  IBM'S Federal Sector Develops the "Compliance Audit" Model to Drive Federal Software Sales.**

14. Due to softening sales of its software to the federal government, IBM's federal software sector, and in particular Dermot Murray (Vice President, U.S. Federal Software), began turning to software usage or "compliance" audits as a way to drive new business from the government and generate and maintain IBM's federal software sales numbers.

15. Upon information and belief, other IBM employees, including Mark Gruzin (Vice President, Federal Software Group), RC Rolfe (Vice President, WW Enterprise Sales and Licensing), Ann Marie Somerville (Rational Brand Executive, U.S. Federal Software), Len Fleischmann (Enterprise Sales Manager), and Kathleen O'Leary (Enterprise Sales Manager), were involved in the use of these audits to drive new business from the government.

16. Beginning in approximately 2011, IBM began deploying compliance audits on its federal government customers through its allegedly independent audit partner, Deloitte & Touche, LLP, as a way to force the federal agencies into new, lucrative, long-term software license deals with IBM.

17. Although the compliance audits were in certain instances authorized under the existing IBM International Program License Agreement (the "ILPA") between IBM and some agencies, IBM would routinely only approach federal agencies in the year that the agency's existing software license was set to expire, and precisely at the time IBM wanted the agency to enter into a new long-term license or renew its existing license, with the idea of a "soft" or "baseline" compliance audit.

18. A "soft" or "baseline" compliance audit was conceived of by IBM as a way of explaining to the affected agency that although IBM may have the right to conduct a full-scale compliance audit, IBM would instead use a soft or baseline audit with the federal customer in order to determine what the customer was using, and what it was not using – all purportedly so that the customer would realize "savings" in a new license deal from software that it was not using, and to be sure the customer's licensing comported with its actual needs.

19. IBM made such representations to federal agencies that had Enterprise License Agreements ("ELAs") that were about to expire, and that were considering a renewal of that ELA or considering entering into a new one, as more fully described herein.

20. In reality, in making these representations to the federal government, IBM had no intention of allowing any federal government agency to realize any savings from its under-deployment of IBM software that was discovered during the audit.  Instead, IBM intended to use the audit as a "hammer," or a negotiating tool, to create leverage that would induce the government agency to agree to a significant new software deal with IBM in order to avoid being assessed the "full" compliance penalty.

21. Mr. Murray, Mr. Gruzin, and others within IBM, including but not limited to Ms. Somerville, Ms. O'Leary, and Mr. Fleischmann, believed that the federal government agencies using IBM's software could not validate their usage of the software or whether they were in compliance with their license agreements with IBM in terms of their software usage and/or installation.  Thus, IBM believed and understood that the agencies had no way to contest the audit findings of IBM and its partner, Deloitte, whether or not those findings were accurate.

22. Mr. Murray, for example, was known within IBM for stating to colleagues that the agencies would have no way of knowing whether IBM's audit results were correct, and that

IBM had the agencies over a barrel because they could not prove that they were in compliance with their license agreements.

23. IBM, under the direction of Mr. Gruzin, Mr. Murray, M r. Fl eischmann, and IBM's internal compliance team headed by RC Rolfe, used the agencies' lack of knowledge and/or their inability to accurately assess the usage and deployment of software licenses to its advantage and against the agencies upon which it deployed the compliance audits.

24. In addition to conducting compliance audits so it could use them as leverage for new deals, once it commissioned an audit to be completed by its allegedly independent audit partner, Deloitte, IBM routinely manipulated the audit results to suit its needs (*i.e.,* to show a compliance penalty that would be a "pain point" for the agencies). In that regard, IBM routinely instructed Deloitte as to the numbers Deloitte should use in the audits. If preliminary results of those audits came back to IBM too "clean," IBM instructed Deloitte to make certain assumptions and changes in the audit results in order to get to results that were acceptable to IBM, so that IBM could force the agency into a new deal.

25. The audit was not an effort to find the truth about the agencies' actual usage of IBM's products. Rather, it was a way in which IBM used its agent Deloitte – which IBM held out as an independent auditor, when in fact it was not – to force the agencies into a new, lucrative software contract for new IBM software that the agencies were not using and did not need.

26. All of this was done with the knowledge and expectation by IBM that whatever the agencies' actual usage of IBM software was, the Deloitte audit results would be manipulated in such a way as to show a substantial difference between "entitlements" (*i.e.,* licenses owned by the agency) and "requirements" (*i.e.,* licenses required to be owned by the agency, given the

agencies' number of installations, users, user ratios, concurrent user metrics, and similar factors), even in those instances when there was no actual over-usage or over-deployment of IBM software by the agency.   IBM relied on its belief that the agencies would not be able to "disprove" the audit results and thus would have to accept them, whether the results shown to the agencies were truthful or not.

27. Once the audit findings were provided or presented to an agency by either Deloitte or IBM, IBM would then "monetize" the results by informing the agency what its over-usage or over-deployment penalty would be, in terms of dollars, if it did not enter into a new, long-term license agreement with IBM.

28. Once the penalty was communicated by IBM to the agency, IBM would then "befriend" the agency by informing the agency that because IBM was its "partner," IBM would reduce or eliminate the compliance penalty, or roll it in to the overall new contract amount, as a "favor" to the agency -- *if* the agency completed a new, long-term, license agreement.   IBM would even allow some agencies to finance the penalty portion of a new contract through IBM's international finance arm, IGF, thus causing those agencies to pay interest on the false penalty amount as well.

29. IBM became proficient at using these compliance audits as leverage to force agencies to enter into new deals for software that they did not want, had not fully utilized in the past, and did not need.   IBM even coined a term internally for this unused, under-deployed, software: "shelfware."

30. For his part, Mr. Murray was renowned within the sales-professional ranks of IBM as being notoriously unscrupulous when it came to selling to the federal government, often telling colleagues and subordinates that he did not care what the government actually needed;

8

rather, he instructed those working on his team that they should sell them everything they could and that they should "stuff the deal like a pig." Upon information and belief, Mr. Murray told his sales staff, whom he and his reports asked to corroborate inflated audit findings, that they could not come back to him or to other IBM management with results that showed a zero-dollar amount for a penalty.

31. Upon information and belief, IBM's federal software sales sector's model of using compliance audits to drive large new license agreements was acknowledged and endorsed at the highest levels of IBM management, including by Len Fleischmann, RC Rolfe, and others.

32. Thus, IBM management fostered a corporate sales environment based on a culture of defrauding the federal government.

33. It is within this environment at IBM that the following specific transactions occurred:

A.      **CENTERS FOR MEDICARE AND MEDICAID**

34. Shortly after the commencement of his employment by IBM in early 2011, Mr. Tang began working on the Centers for Medicare and Medicaid ("CMS") account for IBM. CMS is an Operating Division of the United States Department of Health and Human Services.

35. From approximately January, 2011 until December 31, 2013, Mr. Tang devoted nearly 100% of his time as an employee of IBM to the sales opportunity represented by the CMS account. CMS was his sole account, except for a period of time when he also covered IBM's Department of Education account.

36. At the outset of his work on the CMS account, Mr. Tang was advised that the existing IBM enterprise license agreement ("ELA") with CMS was set to expire at the end of 2013. Mr. Tang was advised that his responsibility would be to build demand for a "software

9

relationship offering" with CMS for the WebSphere brand of IBM software, *i.e.*, to build a demand that would cause CMS to enter into a new long-term software licensing agreement with IBM at the end of its existing license (hereinafter, the "CMS SRO").

37. Mr. Tang, through his efforts with CMS, successfully completed 35 separate software sales transactions for IBM with CMS prior to the December 2013 CMS SRO at issue herein.

38. Commencing in the first quarter of 2013, IBM began to hold internal account planning "kick-off" meetings at which sales employees such as Mr. Tang reported to IBM management, including Mr. Murray, Kathleen O'Leary (the dealmaker on the transaction responsible for all brands of software), and others within IBM what their expected sales for the CMS account would be in 2013, and whether there would be a significant CMS SRO during the year. These account planning meetings continued throughout 2013.

39. One of the items discussed at these kick-off meetings was the issue of a compliance audit and associated penalty, and whether CMS would be subject to such a compliance audit or penalty relating to potential over-deployment of software licenses purchased previously from IBM.

40. In 2013, CMS asked IBM for a compliance audit waiver letter so that it would not be subject to a compliance audit or a compliance penalty. Specifically, Nicole Poist at CMS, who worked for Letitia Royal at CMS, asked Mr. Tang for such a waiver letter.

41. Lockheed Martin, CMS's contractor, also asked IBM for a compliance audit waiver letter on behalf of CMS.

42. Upon information and belief, IBM was obligated to provide this compliance audit waiver letter to CMS because of language in CMS's existing contract with IBM, and because of IBM's prior dealings with CMS in which the letter had been provided.

43. IBM was fully aware that CMS was entitled to this compliance waiver letter, but also knew that providing the letter to CMS would have eliminated any audit-based pressure on CMS to consummate a new, large license agreement in 2013.

44. As an initial response to CMS's request for a compliance audit waiver letter, and instead of simply providing the compliance waiver letter that IBM was obligated to provide, Sherri Gibbs, an IBM software executive who reported to Mr. Murray, instructed Mr. Tang not to provide CMS or Lockheed Martin with any information.

45. Instead of providing the compliance audit waiver letter to CMS that CMS had requested, IBM conducted a compliance audit of CMS, through its audit partner Deloitte, in 2013.

46. The compliance audit waiver letter would have excused CMS from undergoing a compliance audit and compliance penalty.

47. Mr. Tang participated in telephonic meetings between IBM and Deloitte's auditors in which Deloitte expressly stated that Deloitte did not support the audit results that IBM was asking it to find, and could not support a penalty for software overusage, or a penalty of the magnitude being sought by IBM.

48. Dermot Murray informed Mr. Tang that "IBM had CMS over a barrel" with respect to its compliance audit findings, that there was no way CMS could prove the audit results were false, and that CMS would not know one way or another whether the findings were correct.

49. The compliance penalty was contrived by IBM through making false assumptions, and reflected amounts that were not due to IBM.

50. The audit results, after being manipulated by IBM to meet its needs, showed a significant compliance penalty owed to IBM by CMS.  There were material false statements in the CMS compliance audit about the amount of software CMS was using, and about how much CMS owed with respect to that use.

51. At the time or times when IBM made these statements to CMS, IBM knew them to be false, fraudulent, and/or misleading.

52. These false statements were communicated to CMS by IBM, including by Ms. Gibbs.

53. Upon information and belief, these false statements were material to CMS's decision to enter into a new license agreement with IBM.

54. On or about December 31, 2013, CMS agreed to a nearly $195,000,000 license agreement with IBM for, among other things, IBM's WebSphere brand of software (the "CMS Transaction"). The CMS Transaction included a significant compliance penalty that CMS paid to IBM as a result of the false and contrived compliance audit.

55. Had it been able to obtain the compliance waiver letter it requested from IBM – to which it was entitled under its agreement with IBM – CMS could have saved substantial money with regard to the CMS Transaction.

### B. <u>UNITED STATES CUSTOMS AND BORDER PROTECTION AGENCY</u>

56.     IBM closed a new software license deal with the United States Customs and Border Protection Agency ("CBP") in June, 2014 for approximately $150,000,000 (the "CBP License Deal").

57.     The CBP License Deal was based on and driven by a significant compliance penalty, initiated and pursued by Dermot Murray and others within IBM, that was false, fraudulent, and inaccurate.   This compliance penalty inaccurately portrayed CBP software purchased and licensed from IBM as being substantially over-deployed and overused by CBP, when in fact it was neither.

58.     In the spring and summer of 2014, IBM – including Aileen Beardslee, an IBM software manager who worked for Mr. Murray and Kathleen O'Leary – made false and fraudulent statements to CBP regarding CBP's compliance exposure in order to induce CBP into entering into a new license agreement with IBM.   These statements included a claim that software licensed to CBP by IBM was over-deployed and that thus CBP was subject to significant compliance penalties.

59.     IBM believed that CBP could not verify its own software usage and, as a result, would not be able to disprove the alleged audit results that IBM and/or Deloitte presented to CBP.

60.     Upon information and belief, IBM presented a false compliance audit to CBP.

61.     In this regard, IBM, through Dermot Murray and others, was following a pattern and practice of using manipulated compliance penalties to fraudulently induce government agencies to enter into substantial new license deals for software that the agency did not want or need.

62.     Upon information and belief, CBP's decision to enter into the CBP License Deal was based on and materially influenced by false statements made to it by IBM, and was also based on findings by IBM's allegedly independent auditor, Deloitte, which were developed in

concert with IBM and fraudulently presented to CBP to induce CBP to enter into the CBP License Deal.

63.     IBM used the compliance audit and resulting penalty to drive the CBP License Deal at a time when CBP did not need, or want, to purchase a substantial amount of new software.

64.     The CBP compliance penalty was discussed internally within IBM at a spring 2014 WebSphere annual brand conference in Las Vegas.   In addition to Mr. Tang, other representatives of IBM, including Adam Geatz, Aileen Beardslee, and Rob Waldman, were present when this was discussed.

65.     Upon information and belief, Jackie Swett, an IBM employee who was the WebSphere technical specialist on the CBP deal, was required by IBM management to "sign off" on the compliance penalty.

66.     Upon information and belief, Ms. Swett was uncomfortable with agreeing to sign any documentation because she did not have a way to validate whether the compliance penalty was accurate.

67.     Upon information and belief, Ms. Swett disagreed with the amount of compliance penalty being charged to CBP and believed the compliance penalty was false.

68.     Ms. Swett did not believe that CBP had incurred such a substantial compliance penalty, and informed Mr. Tang of this fact.

69.     At a happy hour at Generous George's restaurant in Herndon, Virginia in spring or early summer 2014, Aileen Beardslee informed Mr. Tang that she was leaving the WebSphere brand to replace Kathleen O'Leary, the prior IBM dealmaker on the CBP account.

70.    Ms. Beardslee informed Mr. Tang during this discussion that CBP was forced to pay a fabricated $130,000,000 compliance penalty and that was what was used to drive the CBP License Deal.

71.    Ms. Beardslee and others within IBM informed Mr. Tang that the compliance penalty was not real, and was used as a "driver" or "lead" in order to force CBP into a new licensing agreement with IBM.

72.    Upon information and belief, CBP's decision to enter into the CBP License Deal was materially influenced by the Deloitte audit results, which IBM presented to CBP as true and accurate at a time when IBM knew they were false and fraudulent.  Using the false Deloitte audit results, IBM threatened to charge CBP for alleged "over-deployments" and "overusages" of IBM's software licenses, for the purpose of inducing CBP to enter into the CBP License Deal.

73.    At the time or times when IBM made these statements to CBP, IBM knew them to be false, fraudulent, and/or misleading.

74.    The false statements made by IBM in dealing with CBP materially influenced CBP's decision to enter into a new license agreement.

75.    All or a substantial portion of the compliance penalty has been presented as a claim by IBM to CBP, and has been paid by CBP to IBM.

### C.  UNITED STATES POSTAL SERVICE

76.    The United States Postal Service ("USPS") completed a software license purchase with IBM in June, 2014.  The total contract value was approximately $50,000,000.

77.    In early 2014, Bill Siciliano, an IBM sales representative responsible for the USPS account, informed his supervisors and co-workers at IBM, including Dermot Murray, Carol Cowell, and Kathleen O'Leary (the IBM dealmaker on the USPS deal), that a compliance

15

audit may show that the USPS was over-deployed in its software usage, and could be used as leverage to force a new license agreement.

78.     IBM had previously waived the compliance audit requirement for USPS under its existing license; thus, IBM could not audit USPS's usage and deployment of IBM's software. Upon information and belief, USPS is in possession of a letter from IBM that states that USPS cannot be audited by IBM.

79.     In 2014, in connection with attempting to negotiate a new license agreement with USPS, IBM conducted a compliance audit.  Upon information and belief, USPS agreed to this audit because IBM had informed it that the only way to optimize its software usage, and to realize savings on over-deployed software that it was not using, was to conduct an audit to determine what USPS was actually using.

80.     Upon information and belief, Dermot Murray and Kathleen O'Leary were among the IBM employees who made such statements.

81.     In reality, IBM had no intention of allowing USPS to realize any savings when it made these statements to USPS.

82.     IBM contracted with its compliance partner, Deloitte, to conduct a software usage audit of USPS's software usage.  Upon information and belief, the Deloitte audit findings showed artificially-inflated usage of IBM software by USPS, which was inaccurate.

83.     These false and inflated findings were communicated and presented to USPS by IBM and/or IBM's agent, Deloitte, in an effort to create leverage that would cause USPS to enter into a new license agreement with IBM.

84.    At the time these audit findings were presented to USPS, IBM knew that they were false and inflated. IBM made these statements to USPS with the intent that USPS would rely on them in deciding whether to enter into a new software license with IBM.

85.    USPS determined to enter into a new license agreement with IBM (the "USPS License Deal"). USPS's decision to enter into the USPS License Deal with IBM was materially influenced by the false Deloitte audit results, which were developed and conceived by IBM in concert with its outside auditors, Deloitte, and fraudulently used by IBM to induce USPS to enter into the USPS License Deal.

86.    Upon information and belief, on December 23, 2014, IBM closed the USPS License Deal, worth $50,000,000. Upon information and belief, $40,000,000 of the $50,000,000 was considered payment for penalties arising from the compliance audit.

87.    Bill Siciliano, the IBM sales representative responsible for the USPS account, informed Mr. Tang that the compliance penalty component of the USPS License Deal was used as a "lead" to force USPS into signing a large new deal.

88.    Upon information and belief, Carol Cowell, IBM's Software Client Lead for the USPS account, informed Mr. Siciliano that USPS was not out of compliance and did not owe IBM any compliance penalty. Ms. Cowell was very familiar with the USPS account, as she had worked on the USPS account for years. Upon information and belief, Ms. Cowell told Mr. Siciliano that the compliance penalty asserted against USPS was false.

89.    Upon information and belief, USPS did not owe IBM a significant compliance penalty and was not substantially over-deployed in its usage of IBM software.

90.    At the time or times when IBM made these statements to USPS, IBM knew them to be false, fraudulent, and/or misleading.

91.    All or a substantial portion of the compliance penalty has been presented as a claim by IBM to USPS, and has been paid by to IBM by USPS.

92.    Numerous individuals within IBM were aware of the false nature of the Deloitte audit results, and were aware that those findings were used to induce USPS to enter into the USPS License Deal.  Those individuals include, but are not limited to, Carol Cowell, Kathleen O'Leary, Dermot Murray, and Bill Siciliano.

## D.   SOCIAL SECURITY ADMINISTRATION – SUBCAPACITY LICENSING

93.    In and prior to 2011, IBM and the Social Security Administration ("SSA") were parties to an license agreement pursuant to which IBM licensed certain mainframe and distributed environment software and provided support and maintenance for that software to SSA.  That license agreement was set to expire at the end of 2011.

94.    IBM was aware, or believed, that SSA would not require a substantial amount of new software when its license agreement expired at the end of 2011.  IBM determined that it needed to create demand within SSA for a substantial new license, so that SSA would do a new deal with IBM and drive revenue to IBM.

95.    Upon information and belief, Marilyn Addie, an IBM sales representative and the software client lead for the SSA account, "ran the numbers" with Quinn Solem (Senior Technical Advisor with SSA) and Jan Cordine (IBM) and determined that SSA needed approximately $600,000 of new software from IBM at the conclusion of the license agreement that expired at the end of 2011.  Ms. Addie provided this number to Dermot Murray, who was then the Vice President of Civilian Federal Software Sales for IBM.  Mr. Murray informed Ms. Addie that this number was not large enough and that IBM needed a larger deal from SSA.

96.     Ultimately, IBM was successful in causing SSA to enter into a $168,000,000 contract at the end of 2011 (hereinafter the "SSA License Deal").  IBM caused SSA to do the SSA License Deal through false, deceptive, and misleading statements designed to cause reliance by SSA.  Upon information and belief, Mr. Murray and those working with him made such statements.

97.     Upon information and belief, SSA did rely on the statements, to its financial detriment.

98.     The SSA License Deal consisted of a software enterprise license sold by IBM to the SSA that permitted SSA to use multiple IBM software brands on SSA's mainframe computers and in its distributed software environment for a period of one year, commencing on or about January 1, 2012. The software brands included IBM's Rational, WebSphere, Tivoli and other IBM software brands.

99.     The SSA License Deal contained two option years, which allowed SSA to extend the contract to cover 2013 and 2014.  SSA did exercise its option years, based on false, fraudulent and deceitful statements made to it by IBM as set forth herein.

100.    SSA was fraudulently induced to enter into the SSA License Deal and to exercise its option years based on the material fraudulent acts and statements by IBM further set forth and described in this Complaint.

101.    In connection with its efforts to sell the SSA Enterprise License Agreement to SSA, and at a time when SSA was inclined not to renew, or fully renew, its prior license arrangement with IBM, IBM, through the knowing and intentional acts of its employees and agents, presented SSA with false, inaccurate, and misleading information regarding sub-capacity licensing.  Upon information and belief, IBM employees, including Chris Smith, a Software

Client Lead for the SSA account who worked for Dermot Murray, made false and misleading representations to SSA that SSA could not purchase the SSA License or utilize the software purchased thereunder on a "sub-capacity" basis from IBM.

102.    The SSA License Deal and the license agreement that was attached thereto (the ILPA), identified products, including products that SSA had requested to be licensed on a sub-capacity basis, as being eligible for sub-capacity licensing.

103.    Sub-capacity licensing permits software to be used on only a portion of a server or mainframe, and not the entire server or mainframe; thus, the software is deployed to a much lesser extent (and lesser cost) than being licensed at full capacity under a traditional enterprise license agreement, pursuant to which an entire server or network of servers can access the software.

104.    IBM uses a unit of measurement called a processor value unit ("PVU") to determine licensing costs for distributed software. PVUs are determined by ascertaining the number of processors running on a server and the number of core chips running on each processor. IBM maintains PVU-per-core ratings for processor technologies on its website. Using IBM's ratings and licensing formulas, it is possible to determine licensing costs for software fully deployed across a server and on a sub-capacity basis.

105.    Under sub-capacity licensing, if the number of processors on the same server that could access the software was limited (because the customer did not need the software to be run on all processors), the calculated license fee would be substantially less.

106.    In certain instances, purchasing software for an entire server, as opposed to on a sub-capacity basis, results in the customer having over-purchasing that software because it does not need all of the software purchased.

107.    As a result, under sub-capacity licensing, a customer can purchase or license software for only a part of the server, thus matching the software purchased with the customer's actual usage needs, and significantly reducing cost (and, accordingly, IBM's revenue and profit).

108.    In 2011, SSA made a specific inquiry to IBM about whether SSA could enter into a sub-capacity license arrangement with IBM to determine the agency's software requirements after the expiration of its existing license agreement in 2011. This would have substantially reduced the cost to SSA of purchasing new software. SSA made this inquiry because it did not believe that it required significant additional software from IBM at the end of its existing license agreement in 2011, and because it wanted to buy only (1) a small amount of net new software from IBM, to be run on a limited subset of servers and mainframe capacity, and (2) maintenance support for its existing software.

109.    Chris Smith was the software client representative at IBM for the SSA account in 2011. Upon information and belief, SSA made this sub-capacity licensing request to Chris Smith in late 2011.

110.    Upon information and belief, in late 2011, Chris Smith was told by Dermot Murray at IBM to inform SSA, in response to SSA's inquiry, that SSA could not do a sub-capacity license deal. Mr. Murray knew at the time that SSA was eligible for sub-capacity licensing under its contract, yet instructed at least Chris Smith, and possibly other IBM employees, to inform SSA otherwise.

111.    At the time Mr. Murray instructed Mr. Smith to make these false and misleading statements to SSA, Mr. Murray was renowned within IBM's Federal Software Sales Group for instructing his federal software sales team to "stuff the deal like a pig" and to "sell the government anything you can, regardless of whether they need it or not."

112.     Upon information and belief, following instructions from Mr. Murray, in late 2011, Mr. Smith of IBM informed SSA that SSA could not do a sub-capacity license deal with IBM, even though IBM knew and understood that it could do such a deal, based on the terms and conditions of IBM's license agreement.

113.     Upon information and belief, Mr. Smith made these statements to SSA at SSA's offices, and at the instruction of Mr. Murray, in order that IBM could realize greater revenues and profits from achieving a substantial enterprise licensing deal with SSA.

114.     When Mr. Smith and IBM falsely informed SSA that it could not purchase software or do the SSA License Deal on a sub-capacity basis, Mr. Smith and IBM intended to coerce SSA into purchasing software that IBM knew SSA did not need and could not use (*i.e.*, shelfware).

115.     When IBM told SSA that it could not purchase licenses or deploy software purchased thereunder on a sub-capacity basis, IBM knew (1) that sub-capacity licensing was in fact available to SSA under the ILPA, (2) that the software could be purchased on a sub-capacity basis and (3) that this would have substantially reduced costs to SSA (and, accordingly, IBM's revenue and profit).

116.     IBM intentionally concealed this information from SSA when negotiating the SSA License Deal.

117.     The statements made by IBM in connection with the SSA License Deal that SSA could not purchase the license on a sub-capacity basis were false, misleading, and fraudulent, and IBM knew they were false, misleading, and fraudulent when it made them to SSA.  These statements were presented by IBM to SSA in an effort to induce SSA to purchase the SSA License Deal, which SSA did.

118.    These statements were material to SSA's decision to enter into a new license agreement that did not include sub-capacity licensing.

119.    IBM was aware that its software could be licensed on a sub-capacity basis to SSA, but did not want to inform SSA of this, and intentionally and fraudulently concealed this information from SSA, because doing so would have rendered the size of the deal that IBM ultimately consummated with SSA significantly smaller.

120.    Allowing for sub-capacity licensing in the SSA License Deal also would have made the deal less lucrative for IBM, as IBM would have realized less revenue and/or profit on a sub-capacity licensing deal.

121.    In December 2011, SSA subsequently entered into the SSA License Deal with Four, Inc., an IBM business partner and authorized software reseller.  The contract was for a 3-year fixed price contract consisting of one base year and two one-year option periods.  The deal covered server and mainframe software and was not a sub-capacity license arrangement.

122.    The SSA License Deal was valued at approximately $168,000,000.  It included a substantial amount of software that SSA could not use and did not need.

123.    Upon information and belief, Mr. Smith subsequently was forced out of the SSA account by IBM just before the transaction closed, although he is still employed by IBM.

124.    Had IBM told SSA the truth when negotiating the SSA License Deal - *i.e.,* that it could do a sub-capacity license deal - SSA could have saved substantial money, potentially millions of dollars, by entering into that type of license deal instead.

125.    The SSA License Deal resulted in SSA having millions of dollars of shelfware. IBM knew that the deal would include shelfware when it entered into this deal with SSA.

126.    Marilyn Addie was an IBM sales representative who was very familiar with the circumstances described herein.  Ms. Addie communicated those circumstances to Mr. Tang during the course of Mr. Tang's taking over the WebSphere portion of the SSA account in early 2014.  Ms. Addie confirmed to Mr. Tang that the SSA had a substantial amount of shelfware that it had bought in 2011, and was not using, because IBM had sold the SSA more software than it needed in 2011.

127.    Bill Siciliano, a WebSphere representative for IBM on the SSA account, told Mr. Tang that the sub-capacity licensing request was made by the SSA in 2011, and was improperly and fraudulently declined by IBM.

128.    Leo Blackwell assumed the role of IBM Software Client Lead on the SSA account in 2011, after Chris Smith was forced out of the role.  Upon information and belief, Mr. Blackwell was also aware that SSA made a sub-capacity licensing request to IBM, and that IBM improperly declined it.

129.    Claudia Arriaga Western is a former IBM Enterprise Software Sales Manager within the Federal Software Sales Group.  Upon information and belief, Ms. Western was aware of Mr. Murray's repeated "stuff the deal" statements and his further statements such as "I don't care what the government needs – sell them everything you can."  Upon information and belief, Ms. Western is also aware of the sub-capacity licensing issues described herein, and knew that IBM improperly declined SSA's request to enter into a sub-capacity arrangement that would have saved the government millions of dollars.

130.    IBM had a duty to be truthful in its dealings with SSA on the sub-capacity issue, but breached that duty when it concealed from SSA the fact that SSA could license software on a sub-capacity basis.

131.   Although SSA had only wanted to purchase maintenance and support and a small amount of new software from IBM, because of the false and fraudulent statements made by IBM, SSA was forced to enter into the SSA License Deal.  SSA was induced to purchase software well beyond what it actually needed, and IBM was aware of that fact.

132.   At the time or times when IBM made these statements to SSA, IBM knew them to be false, fraudulent, and/or misleading.

133.   SSA's decision to enter into the SSA License Deal was materially influenced by these false and fraudulent statements, which IBM presented to SSA and which IBM knew were false and fraudulent.

134.   All or a substantial portion of the SSA License Deal fee has been presented as a claim by IBM to SSA, and has been paid by to IBM by SSA.

## E.  SOCIAL SECURITY ADMINISTRATION – MAINFRAME OVERBILLING

135.   Under the SSA License, IBM licensed both server software and mainframe software.

136.   The SSA License Deal established a watermark licensing amount, measured in Millions of Service Units ("MSUs"), for the mainframe software needed by the SSA.

137.   SSA generated monthly or quarterly reports on mainframe software usage and delivered them to IBM.

138.   During the term of the SSA License, and specifically prior to SSA exercising its options for years two and three under the SSA License Deal, SSA usage, as measured by MSUs, dropped significantly from the amounts included in the SSA License Deal's base year.

139.   Notwithstanding the decline in MSUs, IBM continued to report to Four, Inc. and SSA that SSA was using the same number of MSUs or higher MSUs than SSA was actually

using.  IBM did this to artificially inflate its billings sent to SSA and to increase its revenue and profit.

140.    SSA paid IBM for these higher MSU amounts.

141.    IBM knew that the monthly MSU amounts it was charging SSA were false.

142.    IBM had a duty to be truthful to SSA in billing for monthly MSU amounts, and breached that duty.

143.    Upon information and belief, IBM has excel spreadsheets and other reports that demonstrate that not only was SSA not using more MSUs than it was reporting to IBM, it was in fact using fewer MSUs.  These reports show that SSA was using substantially less mainframe software than IBM was telling Four, Inc. and/or SSA that SSA was using, and far less than the amount for which IBM was billing SSA.

144.    At the time or times when IBM made these statements to SSA, IBM knew them to be false, fraudulent, and/or misleading.

145.    IBM billed SSA for more than the amount of mainframe software that SSA was reporting and for more than the amount of mainframe software IBM knew SSA was actually using.

146.    All or a substantial portion of the mainframe billing under the SSA License Deal has been presented as a claim by IBM to SSA, and has been paid by SSA to IBM.

147.    Numerous individuals within IBM were aware of the false billing of the SSA's mainframe usage.  Upon information and belief, those individuals include, but are not limited to, Dermot Murray, Marilyn Addie, and Jan Cordine.

## F. SOCIAL SECURITY ADMINISTRATION – FALSE STATEMENTS MADE DURING OPTION YEAR NEGOTIATIONS TO INDUCE RENEWALS

148.   In addition, during contract renegotiation or in negotiations surrounding pricing for the two option years under the SSA License Deal, when SSA could have been paying for usage at a lower watermark level for MSUs and spending significantly less, IBM intentionally concealed from SSA that SSA was actually using fewer MSUs than IBM was reporting SSA was using.

149.   IBM had a duty to be truthful in its negotiations with SSA. IBM was required to provide accurate information to SSA concerning its MSU usage, instead of the false, inflated information it reported to SSA. Accurate, truthful reporting by IBM would have allowed SSA to negotiate and pay for a lower amount of MSU usage and payments based thereon for the option years, and thus realize savings.

150.   IBM concealed this material information from SSA to IBM's own financial advantage. IBM knew about SSA's actual usage of software, and had access to other usage information about which SSA was not aware.

151.   Upon information and belief, Dermot Murray, Marilyn Addie, Jan Cordine, and others within IBM are aware of these practices by IBM.

152.   IBM had a duty to negotiate fairly with SSA in pricing the option years of the contract, and failed to do so when it intentionally concealed SSA's actual MSU usage from SSA, and when it knowingly provided false and inaccurate information to SSA.

153.   At the time or times when IBM made these statements to SSA, IBM knew them to be false, fraudulent, and/or misleading.

154.   In reliance on this false information, SSA entered into option year pricing under the SSA License Deal for mainframe software that was substantially in excess of what it should

have been charged.  SSA has paid and continues to pay for the inflated mainframe software usage numbers being provided by IBM under the SSA License Deal on a quarterly basis.

155.    All or a substantial portion of the SSA License fee for these option years has been presented as a claim by IBM to SSA, and has been paid by to IBM.

**COUNT ONE - SSA**
**False Claims Act, 31 U.S.C. § 3729(a)(1)**

**(Knowingly Presenting or Causing to be Presented a False or Fraudulent Claim)**

156.    Relator and the United States reallege and incorporate herein by reference paragraphs 1 through 155.

157.    IBM, through the knowing acts of one or more of its individual  employees or agents, knowingly presented or caused to be presented, to officers, employees or agents of the United States Government, false or fraudulent claims in connection with (a) its efforts to fraudulently induce SSA to enter into the SSA License Deal through falsely informing SSA that it could not do sub-capacity licensing; (b) its billing SSA for MSUs in excess of the MSUs that IBM was aware SSA was using; (c) its falsely and fraudulently inducing SSA to enter into option years two and three based on false reporting of MSU usage and other false statements; and (d) its receipt of payment for each of the foregoing fraudulent and deceitful acts.  These false records and statements were material to the false and fraudulent claims submitted to the United States.

158.    The United States Government has paid all or a substantial portion of the false and fraudulent claims for payment made to it by IBM in connection with the SSA License Deal, mainframe overbilling, and renewing the SSA License Deal in option years two and three.

159.    By virtue of the false or fraudulent claims made or caused to be made by IBM, the United States has suffered damages and, therefore, is entitled to multiple damages under the

28

False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim presented or caused to be presented by IBM.[2]

### COUNT TWO - SSA
### False Claims Act, 31 U.S.C. § 3729(a)(2)

**(Making, Using, or Causing to be Made or Used a False Record or Statement)**

160.     Relator and the United States reallege and incorporate herein by reference paragraphs 1 through 155.

161.     IBM, through the knowing acts of one or more of its individual  employees or agents, knowingly made, used, or caused to be made or used, false records or statements and presented false invoices to SSA in order to get false or fraudulent claims paid or approved by the United States in connection with (1) inducing SSA to enter into the SSA License Deal, (2) pay for MSUs on its mainframe computers at a higher level than SSA was actually using MSUs, and at a higher level than IBM knew SSA was using MSUs, and (3) inducing SSA to enter into option years two and three of the SSA License Deal.

162.     These false records and statements were material to the false and fraudulent claims submitted to the United States.

163.     By virtue of the false or fraudulent claims made or caused to be made by IBM, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim presented or caused to be presented by IBM.[3]

---

[2] See footnote 1 above.

[3] See footnote 1 above.

## COUNT THREE - SSA
## False Claims Act, 31 U.S.C. § 3729(a)(3)

**(Conspiring to Defraud the United States Government Through False or Fraudulent Claims)**

164.    Relator and the United States reallege and incorporate herein by reference paragraphs 1 through 155.

165.    IBM knowingly and intentionally conspired, through the acts of one or more of its individual employees or agents, together with other conspirators known and unknown, including but not limited to Dermot Murray, Mark Gruzin, Kathleen O'Leary, and Len Fleischmann, to defraud the United States Government by getting false or fraudulent claims paid or approved through the knowing use of trickery, chicanery, deceit, and misrepresentation in connection with inducing SSA to purchase the SSA License Deal, overbilling for MSUs, and in inducing SSA to enter into option years two and three under the SSA License Deal. As part of this conspiracy, the conspirators presented false and fraudulent claims to the United States for payment and received payment for these claims.

166.    The false records and statements used during this conspiracy were material to the false and fraudulent claims submitted to the United States.

167.    By virtue of IBM's and the co-conspirators' conspiracy to defraud the United States Government through false or fraudulent claims, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim presented or caused to be presented by IBM.[4]

---

[4] See footnote 1 above.

## COUNT FOUR - SSA
## (Fraudulent Inducement of Contract)

168.    Relator and the United States reallege and incorporate herein by reference each and every allegation set forth in paragraphs 1 through 155.

169.    By virtue of the acts described above, IBM knowingly and fraudulently engaged in a course of conduct designed to fraudulently induce SSA to enter into the SSA License Deal. IBM's plan to fraudulently induce SSA to do a deal was carried out through various steps, including falsely informing SSA that it could not do sub-capacity licensing, billing SSA for MSUs in excess of the MSUs that IBM was aware SSA was using, falsely and fraudulently inducing SSA to enter into option years two and three based on false reporting of MSU usage, and other false statements.

170.    IBM's statements and misrepresentations to SSA, as part of its fraudulent course of conduct, were material to SSA's decision to agree to the SSA License Deal.

171.    Having been fraudulently induced to enter into the SSA License Deal, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim presented or caused to be presented by IBM.[5]

## COUNT FIVE – CBP
## False Claims Act, 31 U.S.C. § 3729(a)(1)

## (Knowingly Presenting or Causing to be Presented a False or Fraudulent Claim)

172.    Relator and the United States reallege and incorporate herein by reference each and every allegation set forth in paragraphs 1 through 155.

---

[5] See footnote 1 above.

173.    IBM, through the knowing acts of one or more of its individual employees or agents, knowingly presented or caused to be presented, to officers, employees or agents of the United States Government, false or fraudulent claims in connection with its efforts to have CBP enter into the CBP License Deal, and in connection with receiving payment for the CBP License Deal. These false records and statements were material to the false and fraudulent claims submitted to the United States.

174.    The United States Government has paid all or a substantial portion of the false and fraudulent claims for payment made to it by IBM in connection with the CBP License Deal.

175.    By virtue of the false or fraudulent claims made or caused to be made by IBM, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim presented or caused to be presented by IBM.

**COUNT SIX – CBP**
**False Claims Act, 31 U.S.C. § 3729(a)(2)**

**(Making, Using, or Causing to be Made or Used a False Record or Statement)**

176.    Relator and the United States reallege and incorporate herein by reference each and every allegation set forth in paragraphs 1 through 155.

177.    IBM, through the knowing acts of one or more of its individual employees or agents, knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States in connection with inducing CBP to purchase the CBP License Deal that IBM sold to CBP in 2014, and in seeking payment for the CBP License Deal. These false records and statements were material to the false and fraudulent claims submitted to the United States.

178.    By virtue of the false or fraudulent claims made or caused to be made by IBM, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim presented or caused to be presented by IBM.

**COUNT SEVEN– CBP**
**False Claims Act, 31 U.S.C. § 3729(a)(3)**

**(Conspiring to Defraud the United States Government Through False or Fraudulent Claims)**

179.    Relator and the United States reallege and incorporate herein by reference paragraphs 1 through 155.

180.    IBM knowingly and intentionally conspired, through the acts of one or more of its individual employees or agents, together with other conspirators known and unknown, including but not limited to Dermot Murray, Aileen Beardslee, Kathleen O'Leary, and Len Fleischmann, to defraud the United States Government by getting false or fraudulent claims paid or approved through the knowing use of trickery, chicanery, deceit, and misrepresentation in connection with inducing CBP to purchase the license that IBM sold to CBP in 2014, and in seeking payment from CBP. As part of this conspiracy, the conspirators presented false and fraudulent claims to the United States for payment and received payment for these claims. In addition, false records and statements used during this conspiracy were material to the false and fraudulent claims submitted to the United States.

181.    By virtue of IBM's and the co-conspirators' conspiracy to defraud the United States Government through false or fraudulent claims, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim presented or caused to be presented by IBM.

## COUNT EIGHT – CBP
### (Fraudulent Inducement of Contract)

182.     Relator and the United States reallege and incorporate herein by reference each and every allegation set forth in paragraphs 1 through 155.

183.     By virtue of the acts described above, IBM knowingly and fraudulently engaged in a course of conduct designed to fraudulently induce CBP to enter into the CBP License Deal. IBM's plan to fraudulently induce CBP to do the deal was carried out through various steps, including conducting a compliance audit for the purpose of justifying a penalty, and then using that penalty as a lever in negotiations with CBP concerning a new deal.

184.     IBM's statements and misrepresentations to CBP, as part of its fraudulent course of conduct, were material to CBP's decision to agree to the CBP License Deal.

185.     Having been fraudulently induced to enter into the CBP License Deal, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim presented or caused to be presented by IBM.[6]

## COUNT NINE - USPS
### False Claims Act, 31 U.S.C. § 3729(a)(1)

**(Knowingly Presenting or Causing to be Presented a False or Fraudulent Claim)**

186.     Relator and the United States reallege and incorporate herein by reference each and every allegation set forth in paragraphs 1 through 155.

187.     IBM, through the knowing acts of one or more of its individual employees or agents, knowingly presented or caused to be presented, to officers, employees or agents of the United States Government, false or fraudulent claims in connection with its efforts to have USPS

---

[6] See footnote 1 above.

enter into the USPS License Deal, and in connection with receiving payment for the USPS License Deal.

188.    The United States Government has paid all or a substantial portion of the false and fraudulent claims for payment made to it by IBM in connection with the USPS License Deal.

189.    By virtue of the false or fraudulent claims made or caused to be made by IBM, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim presented or caused to be presented by IBM.[7]

### COUNT TEN – USPS
### False Claims Act, 31 U.S.C. § 3729(a)(2)

**(Making, Using, or Causing to be Made or Used a False Record or Statement)**

190.    Relator and the United States reallege and incorporate by reference each and every allegation set forth in paragraphs 1 through 155.

191.    IBM, through the knowing acts of one or more of its individual employees or agents, knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States in connection with inducing USPS to purchase the USPS License Deal that IBM sold to USPS in 2014 and in seeking payment for the License Deal. These false records and statements were material to the false and fraudulent claims submitted to the United States.

192.    By virtue of the false or fraudulent claims made or caused to be made by IBM, the United States has suffered damages and, therefore, is entitled to multiple damages under the

---

[7] See footnote 1 above.

False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim presented or caused to be presented by IBM.

## COUNT ELEVEN– USPS
## False Claims Act, 31 U.S.C. § 3729(a)(3)

### (Conspiring to Defraud the United States Government Through False or Fraudulent Claims)

193.   Relator and the United States reallege and incorporate herein by reference paragraphs 1 through 155.

194.   IBM knowingly and intentionally conspired, through the acts of one or more of its individual employees or agents, together with other conspirators known and unknown, including but not limited to Dermot Murray, Kathleen O'Leary, and Len Fleischmann, to defraud the United States Government by getting false or fraudulent claims paid or approved through the knowing use of trickery, chicanery, deceit, and misrepresentation in connection with inducing USPS to purchase the USPS License Deal that IBM sold to the USPS in 2014 and in seeking payment for the License Deal.  As part of this conspiracy, the conspirators presented false and fraudulent claims to the United States for payment and received payment for these claims.  In addition, false records and statements used during this conspiracy were material to the false and fraudulent claims submitted to the United States.

195.   By virtue of IBM's and the co-conspirators' conspiracy to defraud the United States Government through false or fraudulent claims, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim presented or caused to be presented by IBM.

## COUNT TWELVE – USPS
### (Fraudulent Inducement of Contract)

196.    Relator and the United States reallege and incorporate herein by reference each and every allegation set forth in paragraphs 1 through 155.

197.    By virtue of the acts described above, IBM knowingly and fraudulently engaged in a course of conduct designed to fraudulently induce USPS to enter into the USPS License Deal.  IBM's plan to fraudulently induce USPS to do the deal was carried out through various steps, including conducting a compliance audit for the purpose of justifying a penalty, and then using that penalty as a lever in negotiations with USPS concerning a new deal.

198.    IBM's statements and misrepresentations to USPS as part of its fraudulent course of conduct were material to USPS's decision to agree to the USPS License Deal.

199.    Having been fraudulently induced to enter into the USPS License Deal, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim presented or caused to be presented by IBM.[8]

## COUNT THIRTEEN - CMS
### False Claims Act, 31 U.S.C. § 3729(a)(1)

### (Knowingly Presenting or Causing to be Presented a False or Fraudulent Claim)

200.    Relator and the United States reallege and incorporate herein by reference each and every allegation set forth in paragraphs 1 through 155.

201.    IBM, through the knowing acts of one or more of its individual employees or agents, knowingly presented or caused to be presented, to officers, employees or agents of the United States Government, false or fraudulent claims in connection with its efforts to have CMS

[8] See footnote 1 above.

enter into the CMS License Deal, and in connection with receiving payment for the CMS License Deal.

202.    The United States Government has paid all or a substantial portion of the false and fraudulent claims for payment made to it by IBM in connection with the CMS License Deal.

203.    By virtue of the false or fraudulent claims made or caused to be made by IBM, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim presented or caused to be presented by a defendant.

## COUNT FOURTEEN – CMS
### False Claims Act, 31 U.S.C. § 3729(a)(2)

**(Making, Using, or Causing to be Made or Used a False Record or Statement)**

204.    Relator and the United States reallege and incorporate herein by reference each and every allegation set forth in paragraphs 1 through 155.

205.    IBM, through the knowing acts of one or more of its individual employees or agents, knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States in connection with inducing CMS to purchase the CMS License Deal that IBM sold to CMS in 2013 and in seeking payment for the CMS License Deal.  These false records and statements were material to the false and fraudulent claims submitted to the United States.

206.    By virtue of the false or fraudulent claims made or caused to be made by IBM, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim presented or caused to be presented by IBM.

## COUNT FIFTEEN – CMS
### False Claims Act, 31 U.S.C. § 3729(a)(3)

**(Conspiring to Defraud the United States Government Through False or Fraudulent Claims)**

207.    Relator and the United States re-allege and incorporate herein by reference paragraphs 1 through 155.

208.    IBM knowingly and intentionally conspired, through the acts of one or more of its individual employees or agents, together with other conspirators known and unknown, including but not limited to Dermot Murray, Sherri Gibbs, Kathleen O'Leary, and Len Fleischmann, to defraud the United States Government by getting false or fraudulent claims paid or approved through the knowing use of trickery, chicanery, deceit, and misrepresentation in connection with inducing CMS to purchase the license that IBM sold to CMS in 2013 and in seeking payment for this license.  As part of this conspiracy, the conspirators presented false and fraudulent claims to the United States for payment and received payment for these claims.  In addition, false records and statements used during this conspiracy were material to the false and fraudulent claims submitted to the United States.

209.    By virtue of IBM's and the co-conspirators' conspiracy to defraud the United States Government through false or fraudulent claims, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim presented or caused to be presented by IBM.[9]

---

[9] See footnote 1 above.

## COUNT SIXTEEN– CMS
### (Fraudulent Inducement of Contract)

210.    Relator and the United States reallege and incorporate herein by reference each and every allegation set forth in paragraphs 1 through 155.

211.    By virtue of the acts described above, IBM knowingly and fraudulently engaged in a course of conduct designed to fraudulently induce CMS to enter into the CMS License Deal. IBM's plan to fraudulently induce CMS to do the deal was carried out through various steps, including conducting a compliance audit for the purpose of justifying a penalty, and then using that penalty as a lever in negotiations with CMS concerning a new deal.

212.    IBM's statements and misrepresentations to CMS as part of its fraudulent course of conduct were material to USPS's decision to agree to the CMS License Deal.

213.    Having been fraudulently induced to enter into the CMS License Deal, the United States has suffered damages and, therefore, is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false or fraudulent claim presented or caused to be presented by IBM.[10]

WHEREFORE, the Relator demands and prays that judgment be entered in favor of the United States and against IBM as follows:

A.    On all Counts under the False Claims Act, as amended, for the multiple of the amount of the United States' damages and civil penalties as are required by law, together with such further relief as may be just and proper including prejudgment and post-judgment interest thereon;

---

[10] See footnote 1 above.

B.      That Plaintiff be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

C.      That Plaintiff be awarded all costs of this action, including attorneys' fees and costs; and

D.      That Plaintiff recovers such other relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury.

Respectfully Submitted,

Louis E. Dolan, Jr. (D.C. Bar No. 442881)
Emily Crandall Harlan (D.C. Bar No. 989267)
David Vicinanzo (*pro hac vice forthcoming*)
Nixon Peabody LLP
799 9th Street, N.W., Suite 500
Washington, DC 20001
(202) 585-8000
(202) 585-8080 (facsimile)
ldolan@nixonpeabody.com
eharlan@nixonpeabody.com
dvicinanzo@nixonpeabody.com

*Attorneys for Plaintiff Charles W. Tang*

## AFFIRMATION OF CHARLES W. TANG

I, Charles W. Tang, plaintiff herein, being duly sworn, affirm that I have read the foregoing Complaint and do hereby declare, under penalty of perjury, that the facts set forth therein are true and correct to the best of my knowledge, information and belief.

Given under my hand this _30_ day of _August_ , 2016.

_____
Charles W. Tang